532 A.2d 358

**JUDICIAL INQUIRY AND REVIEW BOARD OF the SUPREME COURT OF PENNSYLVANIA, Petitioner,**

v.

**Honorable Harold B. FINK, Jr., President Judge, the Court of Common Pleas of Potter County Pennsylvania, Respondent.**

Supreme Court of Pennsylvania.

Argued June 16, 1987.

Decided Oct. 15, 1987.

Robert L. Potter, Pittsburgh, Robert Keuch, Harrisburg, Executive Director, J.I.R.B., for J.I.R.B.

Samuel C. Stretton, West Chester, for respondent.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

This case is a review of the recommendation of the Judicial Inquiry and Review Board that Judge Harold B. Fink be removed from office. For the reasons that follow, we affirm the Board's recommendation and order that Harold B. Fink be removed from his position as Judge of the Court of Common Pleas of Potter County.

On August 17, 1982 the late Judge John Bodley, of the Court of Common Pleas of Bucks County witnessed a sentencing proceeding conducted by Judge Fink (hereinafter "Respondent"). Judge Bodley wrote to the State Court Administrator concerning this proceeding and stated that Respondent was "cruel and sadistic," "offensive," and that he had acted "consciously" and "abominably." This complaint was directed to the Judicial Inquiry and Review Board (hereinafter "the Board"), which, by August of 1984 had received other complaints alleging misbehavior of Respondent.

On November 9, 1984 the Board notified Respondent that it was conducting an inquiry and investigation concerning complaints which had been received concerning his judicial conduct. Thereafter, on April 16, 17, and 18, 1986 the Board conducted an Investigative Hearing before a panel of two Board members. Respondent was present at these hearings, was represented by counsel, and was permitted to testify, although he was not permitted to cross-examine witnesses.

On June 20, 1986 the Board issued a "Notice of Institution of Formal Proceedings," and set forth seventeen counts of alleged judicial misconduct. On July 29, 1986, this Court, upon recommendation of the Board, reassigned Respondent to non-adjudicative duties.

Formal hearings before three members of the Board were conducted between October 15, 1986 and February 9, 1987. A special prosecutor presented the case against Respondent on October 15, 16, 17 and November 20. Respondent presented evidence on November 20, 21, December 3, 4, 1986, and February 2 and 9, 1987. On March 2, 1987 the Board issued a Report in which it adopted findings of fact and conclusions of law with respect to six counts. One count and parts of two other counts had been withdrawn, and the Board declined to address the remaining counts, concluding that Respondent's misconduct with respect to

the six counts mentioned compelled his removal from office.[1]

The case comes to this Court for de novo review.[2] The record consists of approximately 2,300 pages of testimony, at least 500 pages of briefs, memoranda, letters and summaries, and 100 evidentiary exhibits comprising approximately 3,000 pages of written materials, all of which we have carefully reviewed.

## I. BACKGROUND OF THE CASE

In an attempt to set forth a framework in which the charges, findings and conclusions of the Board may be understood, we preface our summary of the Board's findings with a short synopsis of the case. Although there were isolated instances of conflict between Respondent and various local attorneys—the complainants in this case—before 1984, the primary event which seems to have precipitated the judicial conduct complained of was the decision of the Potter County District Attorney to prosecute two members of the Potter County bar for tampering with evidence and hindering prosecution when they withheld evidence found at

1. The charges which were not addressed by the Board were:
    1. Seven violations of the Pennsylvania Sentencing Code;
    2. Two counts of failure to apply Pa.R.Crim.P. 4010(B)(1).
    3. Two counts of imposing illegal sentences of banishment;
    4. One count of non-compliance with the blood testing statute;
    5. Two counts of improperly using judicial office to influence others (a third count *was* addressed by the Board).
    6. Two counts of abusive and discourteous conduct;
    7. One count of judicial plea bargaining;
    8. Misconduct in the filming of court proceedings;
    9. Improper judicial conduct based on antagonism toward attorneys;
    10. Empaneling student juries and paraofficials after Respondent had been directed by the Chief Justice of Pennsylvania not to do so;
    11. Breach of confidentiality of Judicial Board proceedings.

2. Article V, Section 18(h) of the Pennsylvania Constitution, in pertinent part, provides:
    The Supreme Court shall review the record of the board's proceedings on the law and facts and may permit the introduction of additional evidence. It shall order suspension, removal, discipline or compulsory retirement, or wholly reject the recommendation, as it finds just and proper.

the crime scene in a murder trial. This matter will be discussed more fully at Section III C, infra, but for now it will suffice to point out that the attorneys prosecuted, Walter and George Stenhach, were Respondent's friends, that he attempted to discourage their prosecution, and that he became angry with those whom he perceived as causing the prosecution.

When it became apparent that the Stenhach prosecution would proceed in spite of Respondent's efforts to abort it, there developed a tension between Respondent and the district attorney, discussed infra, which had an effect on Respondent's treatment of legal matters involving the district attorney, and which became known to other members of the bar. The bar of Potter County is small, consisting only of eleven members, and there apparently developed a cleavage between those who increasingly saw Respondent's behavior as injudicious and those who did not. By August of 1984, the relationship between Respondent and the District Attorney of Potter County deteriorated to the point that the district attorney requested a Judicial Inquiry and Review Board investigation of Respondent, and on October 18, 1984 the Potter County Bar Association passed a resolution, by a vote of 7 to 4, calling for the Judicial Inquiry and Review Board to conduct an investigation of Respondent's judicial conduct.

## II.  THE MYSTERY WITNESS

As a second preliminary matter, we address Respondent's claim that the Board erred in determining Respondent and his counsel attempted to deceive the Board when they failed to disclose their full knowledge of the truthfulness of a witness whose testimony they proposed to offer. The majority of the Board found that Respondent and his counsel engaged in an effort to deceive the Board by proposing to offer the testimony of an unidentified person, a "mystery witness," who would testify that some of the complainants who had testified against Respondent were involved with illegal drug use. The "mystery witness" was unidentified

because allegedly he was cooperating with police agencies and there had been threats on his life.

The gravamen of the "mystery witness's" testimony would have been that the complainants who had testified against Respondent were users of illegal drugs and were falsely testifying against Respondent in an attempt to remove him from office because he was known to oppose illegal drug use. Respondent proposed, therefore, inter alia, that the "mystery witness's" identity remain secret and that he not be cross-examined by the special prosecutor. The Board was unwilling to accede to these conditions for the appearance of the "mystery witness," and the "mystery witness" never testified. It later was revealed that Respondent, his counsel, and counsel for the "mystery witness" knew at the time these proposals were made to the Board that the "mystery witness" had failed polygraph tests administered by the FBI and had admitted to the FBI that his testimony was a lie.

The majority found that Respondent, his attorney and an attorney representing the "mystery witness" conspired to perpetrate a fraud on the Board by failing to tell the Board that the "mystery witness" had failed the polygraph test and had admitted to the FBI that he was lying. The majority also found that the Respondent, his attorney and the attorney for the "mystery witness" attempted to place unreasonable restrictions on the calling of the "mystery witness" so that Respondent could later claim that he was denied the right to call a critical witness.

Two members of the Board dissented to these findings on the grounds that the evidence did not indicate that there was any attempt at fraud. Although a majority of the Board determined that information concerning the witness's truthfulness should have been forthcoming when counsel made his offer of proof, the minority concluded that counsel's failure to do this did not amount to fraud because counsel believed that it was not proper to address the truthfulness question when making an offer of proof, and because counsel intended to elicit the polygraph and admis-

sion of lying evidence on direct examination. The minority analyzed this dispute as one which concerns whether the polygraph evidence and admission of lying goes to the weight of the evidence or to its admissibility, a matter on which reasonable minds can disagree. Further, the minority observed that counsel for the "mystery witness" consistently asserted his belief in the truth of his client's testimony, the polygraph examinations notwithstanding. Finally, because counsel for the "mystery witness" communicated his concerns for his client's safety to Respondent and his counsel, all three may well have been acting to protect the "mystery witness" from a perceived threat of death, not to lay the groundwork for future claims of error in the proceedings. For all these reasons, the minority concluded that counsel for respondent was doing no more than zealously defending his client and that in any event, counsel's behavior did not constitute an attempted fraud.

We do not address or consider the Board's findings that Respondent attempted to deceive the Board concerning the proffered testimony of the "mystery witness" because those findings do not concern formal charges made against the Respondent. If the Board wishes to initiate action against the parties involved in the "mystery witness" episode, then formal proceedings should be commenced, those charged should be notified of the charges against them, and they should be given an opportunity to prepare a defense and respond to the charges. For purposes of the adjudication of this case, the "mystery witness" matter has no bearing and forms no part of our consideration or rationale.

### III.  THE BOARD'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

■   With the exception of the Board's finding concerning the "mystery witness," the entire Board agreed on the facts of the case and the legal conclusions which derive from those facts, although the two minority Board members dissented to the majority's recommendation of removal from office, and recommended instead that Respondent be

suspended without pay for two years. The facts and conclusions of law on which the Board unanimously agreed, which are either undisputed or based upon the Board's determination of the Respondent's credibility, are as follows:

A. IMPROPER COMMUNICATION WITH PARTIES TO LITIGATION PENDING BEFORE RESPONDENT. In June of 1979 Martin & Hess Real Estate, Inc. brought an action against the Potter County Planning Commission (No 410 of 1979, C.P. Potter County) to adjudicate the question of whether the Commission's failure to act on a proposed real estate development plan was tantamount to approval of the plan. The case was listed before Respondent. The Commission's attorney advised his client that since the Commission had not acted within its statutorily allotted time, the plaintiff would prevail, and he recommended that the Commission allow the plaintiff to take a default judgment.

When Respondent learned that the plaintiff was about to take a default judgment, he contacted the Executive Director of the Commission directly, without notice to the plaintiff that he was doing so, and suggested to the Executive Director that the Commission had a defense which had not been raised and that the Commission's lawyer should petition to file an answer *nunc pro tunc*. Respondent then met *ex parte* with the Commission's lawyer and gave him the same advice. The Commission filed the suggested motion. Respondent then denied plaintiff's motion for default judgment and granted the Commission's petition to file a late answer. Respondent also denied plaintiff's motion for judgment on the pleadings and certified the question for appeal. The matter was finally settled on appeal.

The Board concluded that Respondent's actions violated Canons 2(A) and 3(A) of the Code of Judicial Conduct.[3]

3. Canon 2(A) of the Code of Judicial Conduct provides:

A Judge Should Avoid Impropriety and the Appearance of Impropriety in All His Activities

A. A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public

Canon 2(A) requires that judges avoid even the appearance of impropriety and promote public confidence in the integrity and impartiality of the judiciary. Canon 3(A) requires that judges perform their duties impartially and with faithful adherence to the law.

As the Board pointed out, for a judge to contact one of the parties before him *ex parte* and direct that party's defense, and then grant motions based upon his *ex parte* advice is unconscionable. Even Respondent admitted that his actions in this case were "terrible" and "dead wrong."

B. ABUSE OF CRIMINAL CONTEMPT POWERS. In November of 1984 Respondent presided over a child custody dispute, *Kinter v. Kinter*, No. 347 of 1984 (C.P. Potter County), in which Attorney Daniel Glassmire, a complainant in this case, represented the minor's father, a resident of Ohio, who sought the return of his runaway daughter. The daughter was staying with her brother, William Kinter, of Potter County, Pennsylvania and did not wish to return to Ohio. The question in the *Kinter* case was whether the daughter should remain with her brother or be returned to her father in Ohio.

During a hearing on preliminary objections, Respondent declared a recess and asked to meet alone in chambers with David Kinter, another son (not the defendant-son) of the plaintiff. At this meeting Respondent informed David Kinter that Respondent and Attorney Glassmire did not get along, that Attorney Glassmire was given to "impractical"

confidence in the integrity and impartiality of the judiciary.
Canon 3(A) provides:

**A Judge Should Perform the duties of His Office Impartially and Diligently**

The official duties of a judge take precedence over all his other activities. His judicial duties include all the duties of his office prescribed by law. In performance of these duties, the following standards apply:

**A. Adjudicative Responsibilities**

(1) A judge should be faithful to the law and maintain professional competence in it. He should be unswayed by partisan interests, public clamor, or fear of criticism.

solutions to problems, that Attorney Glassmire had "bad mouthed" the judge, and that Attorney Glassmire should not be involved in attempting to work out a "satisfactory conclusion" to the case. Respondent's purpose in meeting with David Kinter was to persuade the young man to convince his father to allow the runaway daughter to remain with her brother, at least temporarily.[4]

Subsequently, David Kinter told Attorney Glassmire what the judge had said and Glassmire moved for the judge's recusal. The recusal motion was made orally on the record as follows:

"MR. GLASSMIRE: I would like to make a motion for this Court to recuse himself from this case and have the State Court Administrator appoint another judge to hear this case. In addition, after I have gone through the facts relating to the allegations for the recusal, I would also then be making an immediate motion that the recusal matter be heard by another judge under the Snyder case.

"The allegations and facts that we wish to set forth on the Record regarding the recusal is, number one, that the

**4.** Respondent testified as follows concerning what he told David Kinter at the private in-chambers meeting:

A. I said—certainly I can give you the essence. I think I ought to tell you that I've had some problems with Mr. Glassmire in the past. He is very knowledgeable of the law, but we have had some difficulties based upon his lack of practicality, so I am talking to you, and it's necessary that you understand this.

Furthermore, you ought to know that there have been many times in the past where he's bad mouthed me from time to time, and it's crucial that you have a positive feeling towards me, so I want to tell you this in case he does. That's about the essence of what I told the man.

N.T. 922 (Nov. 20, 1986). Respondent also testified at the investigatory hearing on this subject:

Q. Did you say to Mr. Kinter that you wanted him to act as an emissary to work out what you thought was the proper resolution and that he ought not to involve Mr. Glassmire because Mr. Glassmire would merely be obstructive?

A. No. I, I, I knew that Mr. Glassmire would be obstructive based upon my long experience with Mr. Glassmire. But he has that unfortunate habit—all that I wanted to do was to get the proper solution to the problem that was before me in as expedient a way as possible, and the way I felt to do it was just the way I did it....

N.T. 165 (April 17, 1986).

Court met ex parte with attorney George Stenhach on September 19, 1984 in Wellsboro and signed an Order placing temporary custody of Margot Kinter with Brian Kinter.

"Number two, that said Order was signed without the benefit of testimony and prior to any action, suit, complaint or petition having been filed, and thus before this matter was before this Court's jurisdiction.  -

"Number three, that subsequently at approximately 4:53 P.M., the actions were filed at number 347 of 1984 and at number 348 of 1984 regarding this matter in the Office of the Prothonotary of Potter County.

"Number two—or, next number, excuse me, at 5:05 P.M., the Order described in paragraph two above was filed in the Office of the Prothonotary of Potter County, Pennsylvania.

"Number five, that the regular and customary office hours of the Prothonotary of Potter County, at all times in question, are from 9:00 A.M. to 5:00 P.M.

"Number six, that it has been observed by Attorney Daniel F. Glassmire that this Court's practice and custom with regard to custody matters has been that temporary Orders of the Court are not issued unless and until testimony under oath has first been presented by the party seeking such an Order that demonstrates an emergency exists which requires such an Order to be signed.

"Next number, I believe seven, that there exists an appearance that this Court has acted preferentially and with favoritism as to the said Order presented by Attorney George Stenhach which differs from the manner which similar matters are handled when presented by other attorneys practicing in Potter County before this Court.

"Number eight, that Attorney Daniel F. Glassmire has attended Bar meetings of the Potter County Bar Association and he has heard this Court admit that he has treated Attorney George Stenhach in a manner and fashion more favorable and less demanding than that stated—excuse me, than that standard which he imposes upon other members

of the Potter County Bar practicing in Potter County. That, on the 18th day of October—I think that this is the next numbered paragraph, that the Potter County Bar Association adopted a formal resolution signed by Attorney Daniel F. Glassmire as an officer of the Potter County Bar Association and it, said resolution, was critical of Judge Fink and that Judge Fink has received a copy of said resolution.

"Next numbered paragraph, Judge Fink has on many occasions stated publicly and privately that he dislikes Attorney Daniel F. Glassmire and finds him personally offensive.

"Next number, Judge Fink has stated that Attorney Daniel F. Glassmire should leave Potter County and practice law in Wellsboro, Tioga County, Pennsylvania due to the conflict which exists between Judge Fink and Attorney Daniel F. Glassmire.

"Next number, that Judge Fink has stated that he knows what he would like to do with the lawfirm of Leete and Glassmire but that he could not get away with it. Next number—

"THE COURT: I'm sorry?

"MR. GLASSMIRE: Repeat that one?

"THE COURT: Yes, please.

"MR. GLASSMIRE: That Judge Fink has stated that he knows what he would like to do with the lawfirm of Leete and Glassmire but that he would not get away with it.

"Next number, that the lawfirm of Leete and Glassmire is a two-man lawfirm in the Coudersport area with partners John B. Leete and Daniel F. Glassmire.

"Number seventeen, that Judge Fink has urged the Executive Director of Potter County Children and Youth Services and the Potter County Commissioners that the lawfirm of Leete and Glassmire be discharged as solicitors for Potter County Children and Youth Services despite Judge Fink's admission and statement that the quality of work

done by Leete and Glassmire representing Potter County Children and Youth Services had been good and competent.

"Next number, that on the 9th day of November, 1984, that Judge Fink, in the above-captioned matter, actively sought to speak privately and on an ex parte basis with Andrew Kinter and did so speak with him.

"Next numbered paragraph, that Andrew Kinter was the son of William Kinter.

"Number—next, that Andrew Kinter was a chief witness on behalf of William Kinter and was favorably disposed to William Kinter's case.

"Next number, that said conference between Judge Fink and Andrew Kinter lasted approximately thirty minutes.

"Next number, that immediately subsequent to Judge Fink's conference with Andrew Kinter, that Judge Fink asked to confer with attorneys Daniel F. Glassmire and George Stenhach in the Judge's Chambers.

"Next number, that at the conference in Chambers with Judge Fink, Attorney Stenhach and Attorney Glassmire present, the following statements were made by Judge Fink. Subparagraph (A), that he told Andrew Kinter that he, the Judge, did not get along with counsel (referring to Daniel F. Glassmire). (B), that he had serious differences with counsel (again referring to Daniel F. Glassmire). (C), that those differences would "remain so forevermore". Next subparagraph, (D), the Court then indicated that he knew that Margot Kinter was a dependent child and should be placed with Brian Kinter. Next subparagraph, that he had suggested this result to Andrew Kinter and essentially asked Andrew Kinter to act as a Court's intermediary to discuss this with William Kinter and others and other interested parties to see if this matter could be settled in that fashion. Next subparagraph, he told Daniel F. Glassmire that such settlement discussion would best be implemented if he, Daniel F. Glassmire, did not participate in the negotiations or discussions of such a settlement. Next subparagraph, I believe (G), that Daniel F. Glassmire's

involvement in such discussions would not be beneficial. Next subparagraph, that Daniel F. Glassmire should "stay out of it", referring to said discussions. Next subparagraph, then the Court reiterated that he had told Andrew Kinter that he had "differences" with Attorney Daniel F. Glassmire.

"Next paragraph, that he had told Andrew Kinter that Attorney Daniel F. Glassmire might have inferred that Judge Fink would be less than sincere in how he handled this case.

"No longer a subparagraph, new numbered paragraph. During the discussion in Chambers, the Court became visibly annoyed and upset with Attorney Glassmire for taking notes of the Court's comments.

"Next number, that the Court insisted that Attorney Daniel F. Glassmire write down that he had also said "very nice things about counsel", referring to Attorney Daniel F. Glassmire, said statement being made with reference to what he told Andrew Kinter.

"Next numbered paragraph, the Court notified Attorney Daniel F. Glassmire that he would never again be able to have informal conferences with Daniel F. Glassmire.

"Next number, that Attorney Daniel F. Glassmire was not permitted to reply or speak during a substantial portion of the conference and then at the end of the conference and only then he was allowed to speak for the purpose of addressing why Attorney Daniel F. Glassmire was taking notes and to assure the Court that Attorney Daniel F. Glassmire was not taking the notes for the purpose of "reporting him" to anyone.

"Next numbered paragraph, Judge Fink is intentionally attempting to interfere with attorney/client relationship which exists between Attorney Daniel F. Glassmire and his client, William Kinter.

"Next numbered paragraph, Judge Fink has installed [sic] the seeds of doubt into the mind of William Kinter

regarding the effectiveness of Daniel F. Glassmire representing his case before Judge Fink.

"Next numbered paragraph, that at the close of the proceedings on November 9, 1984, that the Court stated in open Court "we ran into a few problems with counsel, but that's par for the course". That William Kinter was to receive regular reports concerning the status of Margot Kinter under the stipulation, but that he has not received any such reports, said stipulation having been entered on the 9th day of November, 1984.

"Next numbered paragraph, that William Kinter does not believe that he will receive a fair trial before Judge Fink and that there is an appearance of bias and impropriety.

"Your Honor, I would now—that concludes that motion, and I would, of course, like to follow that up with a motion that this recusal motion be heard by another judge, and I cite *Municipal Publications, Inc. versus Snyder* [322 Pa. Super. 464] 469 A.2d 1084 (Pa.Super.1983). Thank you, Your Honor."

Board Exhibit 41, Testimony in the Kinter Custody Hearing, January 25, 1985. Respondent denied the motion and requested that Glassmire file the motion in writing. However, four days later, before Glassmire filed a written motion but after Respondent had reviewed Glassmire's motion from the transcribed notes of testimony, he summoned Glassmire to his office, summarily held him in contempt and fined him $300. Glassmire was given no notice of the pending contempt charge.

Respondent's explanation for the contempt citation was that he was offended by Mr. Glassmire's "arrogance," although Respondent admitted that Glassmire's actions did not obstruct the *Kinter* proceedings. The statutory elements of criminal contempt are (1) misconduct in the presence of the court; (2) an intent to disrupt judicial proceedings; (3) and actual obstruction of the administration of justice. 42 Pa.C.S.A. § 4132(3). Superior Court vacated and reversed the contempt citation on appeal.

The Board found that Respondent issued the contempt citation solely because he was annoyed with Mr. Glassmire and not because Glassmire intended to obstruct the *Kinter* proceeding. In fact, Respondent himself testified that Glassmire's motion for recusal did not obstruct the proceedings. N.T., 930–31 (November 20, 1986). The Board also concluded that Respondent violated Canons 2(A) and 3(A) of the Code of Judicial Conduct in that holding an attorney in criminal contempt of court because he is personally annoyed or displeased with the attorney "created a gross appearance of impropriety, contravened his obligation to be faithful to the law, and has undermined public confidence in the judiciary."

When the *Kinter* matter is reduced to its elements and when it is considered in light of Respondent's personal dislike of Attorney Glassmire, its full import becomes apparent. In substance, what occurred in *Kinter* was that the judge presiding in a custody proceeding, rather than acting as an impartial arbiter, interjected himself into the proceedings by demanding a private meeting with the plaintiff's son and attempted to convince the son that his father's lawyer was not to be trusted. Having undermined the attorney-client relationship, he then attempted to use the son to impose a solution to the case which the judge favored and which was contrary to the relief requested by the father and the disfavored attorney. Finally, to add injury to injury, when the attorney found out what the judge had told his client's son, and when he suggested that the judge was biased against him (which he obviously was) and requested recusal, the judge held the attorney in contempt. Not only is such judicial conduct unacceptable; it rises to the level of outrageousness.

C. IMPROPER USE OF JUDICIAL OFFICE. In August of 1982 Respondent presided over *Commonwealth v. Buchanan*, No. 19, 1982 (C.P. Potter County), a homicide case, in which it became known that defense counsel, Walter and George Stenhach, had withheld a portion of the alleged murder weapon which they had discovered at the

crime scene. Walter and George Stenhach were personal friends of Respondent. When Respondent learned that the district attorney intended to recommend to the Attorney General of Pennsylvania that the Attorney General initiate a criminal action against the Stenhachs, Respondent vigorously attempted to dissuade the district attorney from prosecuting or recommending prosecution. He also "intensely" urged an assistant district attorney to persuade the district attorney not to prosecute. Further, he contacted the Attorney General directly and attempted to convince the Attorney General not to prosecute. Finally, when the Attorney General appointed a special prosecutor, Respondent contacted the special prosecutor and urged the special prosecutor not to initiate a criminal action against the Stenhachs.

The Board concluded that this conduct of Respondent violates Canons 2(A) and 2(B) of the Code of Judicial Conduct. Canon 2(B) precludes a judge from lending the prestige of his office to advance the private interests of others.[5] As the Board observed, "interference by a judge in prosecution decisions adversely affects the appearance of propriety and impartiality, particularly in a one judge county." For these reasons, courts have condemned judges who involve themselves in the decision of whether or not to prosecute a crime. *Gonzalez v. Commission on Judicial Performance*, 33 Cal.3d 359, 657 P.2d 372, 188 Cal.Rptr. 880 (1983):

> ... Judge Gonzalez intentionally exploited his judicial office to attempt to influence the disposition of criminal matters. His conduct therefore constitutes willful misconduct. As a matter of law he has also violated Canon 2(B) of the Code of Judicial Conduct, which provides that "A judge should not allow his family, social or other relationships to influence his judicial conduct or judgment. He should not lend the prestige of his office to

5. Canon 2(B) of the Code of Judicial Conduct provides:
     **B.** A judge should not allow his family, social, or other relationships to influence his judicial conduct or judgment. He should not lend the prestige of his office to advance the private interests of others; nor should he convey or knowingly permit others to convey the impression that they are in a special position to influence him. He should not testify voluntarily as a character witness.

advance the private interests of others; nor should he convey the impression that they are in a special position to influence him ..." * * * Petitioner's insistence that he "saw nothing judicially improper" about his conduct [i.e. approaching district attorneys and urging dismissal] cannot preclude a charge of willful misconduct, for that term embraces intentional conduct that a judge should have known was beyond his judicial authority. Petitioner's patent misunderstanding of the nature of his judicial responsibility serves not to mitigate but to aggravate the severity of his misconduct.

Report of the Board at 10.

We fully agree with the Board that there is likely to be little public confidence in the fairness and impartiality of the judiciary of Pennsylvania when one of its judges openly and brazenly attempts to influence the decision as to whether his friends will be prosecuted.

D. FAILURE TO DISQUALIFY. When Respondent was elected to office in 1977, the campaign was an acrimonious one in which, inter alia, Respondent accused the incumbent, Judge Perry Patterson, of being "soft on crime." Respondent won that election, and in 1982, when former Judge Patterson's son was brought before Respondent on drug related charges, the defendant requested Respondent's recusal. Respondent denied the request and stated that he had no bad feelings against former Judge Patterson and that "The holy ghost came down on my shoulder and cleansed me of all those feelings." Patterson (the son) was convicted by a jury and Respondent sentenced him to 11.5 to 23 months imprisonment. Superior Court reversed the judgment of sentence, ruled that Respondent should have granted the recusal motion, and remanded the case for a new trial before another judge, who sentenced the defendant to ARD.

In *Smoker v. National Fuel Gas Supply Corp.* Respondent admitted that he said, "I hate the damn gas company and if I could find a way to rule against them I would." Thereafter, Respondent denied motions for recusal in *Na-*

*tional Fuel Gas Supply Corp. v. Robinson* and threatened to hold counsel in contempt if he attempted to present evidence of bias in support of his motion of recusal.

The Board found that Respondent's failure to grant the motions of recusal in these cases constituted violation of Canon 3(C)(1)(a) of the Code of Judicial Conduct, which requires a judge to disqualify himself when his impartiality might reasonably be questioned.[6]

■ We note that Respondent claims that his remark about the gas company was made "with tongue in cheek," that he ruled in favor of the gas company after making the remark, and that the entire episode involves "an inconsequential remark which is being blown out of all proportions." Respondent's Answer, Exhibit 2, p. 38. We disagree. The property, well-being, and sometimes the freedom of litigants are in the hands of judges. Tongue-in-cheek remarks which announce that the judge will favor one party over another are grossly improper, and if such remarks are made, the judge who makes them must stand down from any controversy in which he has indicated a bias. Impartiality of courts lies at the heart of our system of justice; it is what makes the system work; and it is not a proper subject for levity.

E. CRITICISM OF THE SUPREME COURT OF PENNSYLVANIA. On September 14, 1984 this Court issued a writ of prohibition against Respondent, who had improperly ordered the Potter County district attorney and various law enforcement officers and staff to submit to depositions in a pending criminal proceeding. In an opinion authored by the Chief Justice, this Court ruled that the criminal law makes

6. Canon 3(C)(1)(a) of the Code of Judicial Conduct provides:
   **C. Disqualification**
   (1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:
   (a) he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding.

no provision for the taking of such depositions and that Respondent abused his jurisdiction in ruling to the contrary.

Upon remand, Respondent in open court stated that this Court's decision was "monstrous," "frivolous," and "a travesty":

I find it monstrous that any Court should overrule a trial Judge who is trying to see that justice prevails, to assign a frivolous reason like it not appearing—there seems to be no authority, says Chief Justice Nix, in all due respect, in the Rules of Criminal Procedure, to allow such a thing, therefore, we'll reverse and the issue wasn't even addressed ... [B]ut I am compelled as I see it to proceed to the trial of this case, and it is so Ordered.... One last word, I cannot say enough, I would like to have a day to expound on what I believe to be a travesty concerning the Commonwealth's refusal to submit the particular witnesses to depositions and the support of that by the Chief Justice of the Supreme Court....

Report of the Board at 13, Exhibit 24 at 27–28, 34.

The Board found that Respondent's comments violated Canons 2(A) and 3(A)(6). Canon 3(A)(6) precludes judges from making public comment about any pending judicial proceeding.[7] With respect to Respondent's criticism of this Court, the Board found that his remarks were destructive, that they tended to undermine public confidence in the

7. Canon 3(A)(6) of the Code of Judicial Conduct provides:
   **3. A Judge Should Perform the Duties of His Office Impartially and Diligently**
   The judicial duties of a judge take precedence over all his other activities. His judicial duties include all the duties of his office prescribed by law. In the performance of these duties, the following standards apply:
   **A. Adjudicative Responsibilities**
   * * * * * *
   (6) A judge should abstain from public comment about a pending proceeding in any court, and should require similar abstention on the part of Court personnel subject to his direction and control. This subsection does not prohibit judges from making public statements in the course of their official duties or from explaining for public information the procedures of the court.

judiciary, and that they were of a serious grievous nature, in violation of Canon 2.

We agree that Respondent's comments were violative of Canon 3(A)(6), but we decline to find any violation of Canon 2. This Court does not enjoy, nor should it, a sovereign immunity from criticism stated by judges, lawyers or citizens of the Commonwealth. Indeed legitimate criticism is often the basis of legal scholarship, and for that reason, it is to be encouraged. However, judges and lawyers are duty-bound to state their criticism in ways that do not scathingly incite the undermining of the public's confidence in the judiciary, and while we believe that Respondent's comments in this case were ill-advised, intemperate in tone, and improper in that they concerned a pending matter before the court, they did not rise to the level of violating Canon 2.

F. INTERJECTION OF RELIGION AND RELIGIOUS BIAS IN JUDICIAL PROCEEDINGS. (a) In *In re Alfred Villa*, No. 9 of 1981 (C.P. Potter County), a case which involved the anti-social conduct of a teenage boy, Respondent interrupted a delinquency hearing and called for an in-chambers conference with the probation officer, the community mental health director, and a guidance counselor. At this meeting, Respondent suggested that the boy might be possessed by demons and that a local priest should examine him to determine whether an exorcism was required. Respondent then called a separate meeting with the boy's parents and told them the same thing. The parents felt compelled to accede to Respondent's request for an examination to determine whether the boy was possessed, because, according to the boy's mother, Respondent spoke with the voice of authority and she was concerned that treatment for her son would not proceed until the judge's wishes were complied with. The boy was examined by a priest and found not to be "possessed by demons," and so no exorcism was performed.

(b) At the close of a probation revocation hearing in *Commonwealth v. Connelly*, No. 24 of 1980 (C.P. Potter County), Respondent, while in judicial robes and seated on

the bench, called the defendant to the bench and handed her a religious card entitled "The Cross in My Pocket." Printed on the card was a religious poem. Respondent testified that he had handed out this card in similar circumstances on approximately six occasions to those whom he believed needed and would accept the message on the card. Respondent feels that he can determine whether a person needs and will accept the card because he has been given "the gift of discernment."

(c) In April of 1986 Respondent presided over a hearing on a motion for reconsideration of sentence in *Commonwealth v. Weeks*, No. 83 of 1985 (C.P. Potter County). At the hearing the defendant testified that he had been "born again," that he had "found" Jesus Christ, and as further evidence of his religious temperament, he began "speaking in tongues." Although Respondent denied the defendant's motion for reconsideration, Respondent, while wearing judicial robes, descended from the bench and physically embraced the defendant as a "brother in Christ."

Similarly, in February 1986 Respondent presided over a protection from abuse hearing in *Commonwealth v. James Watson*, No. 14 of 1986 (C.P. Potter County), during which the defendant testified that he had been "born again" and that he had accepted Jesus Christ as his savior. While wearing judicial robes, Respondent descended from the bench and physically embraced the defendant as a "brother in Christ."

(d) Respondent stated that it was common knowledge in the Potter County Jail and among members of the local bar that he has strong religious convictions, and he stated that it was proper for him to give a lesser sentence to a criminal defendant who was actively engaged in the practice of religion than to one who was not. Because of Respondent's known religious bias, parties who appeared before Respondent frequently professed their religious practices.

(e) In November 1979 Respondent presided over a child custody matter, *Mohr v. Mohr*, No. 544 of 1979 (C.P. Potter County) in which he had previously granted custody of two

minor children to the father. The mother was an admitted alcoholic and unstable person, but at the custody hearing, she stated "I have become a Christian. I have become reborn. I am stable enough." Respondent stated that he believed she had been reborn and urged her to petition the court to change the custody order, but the mother subsequently admitted that she remained an unstable alcoholic.

(f) Respondent testified that his religious activities and profession of religion in the courtroom were intended to "foist" and encourage the belief in and practice of Christianity among Christians. When asked if he would obey a direct order from this Court to cease religious activities in the courtroom, he equivocated.

The Board found that Respondent violated Canons 2(A) and 3(A)(1) of the Code of Judicial Conduct in that he favored certain parties who appeared before him based on their statements of religious belief and practice and in that he attempted to alter the custody arrangements in the *Mohr* case based only on the mother's statement of religious belief.

It is, of course, axiomatic that an individual litigant's religious beliefs and practices may not be considered by any judicial officer in any legal proceeding in this Commonwealth. That a litigant *might be* treated favorably because of his religious identity, rather than because of the merits of his case, would violate the Establishment Clause of the First Amendment and is a concept foreign to any notion of fundamental fairness. And yet the possibility of religiously-biased treatment is precisely what was raised in the cases where Respondent stated in court, in actions and words, his religious preferences. In fact, Respondent himself acknowledged that his religious preferences were so well known that criminal defendants commonly professed Christian beliefs and practices in an attempt to get reduced sentences.

Our system of government is grounded on individual freedom to participate or not participate in religious activity. And this freedom extends, needless to say, to those

involved in civil and criminal litigation. When a judge of a Court of Common Pleas openly indicates a personal affinity for persons of the Christian faith, as opposed to persons of no religious faith or persons of non-Christian faith, he has affixed the imprimatur of state approval on a particular type of religious belief. This is the stuff of oppression, not freedom, and it will not be tolerated in this Commonwealth.

Only last year, although in a different and less egregious context than this case, we stated:

> Pennsylvania, more than any other sovereignty in history, traces its origins directly to the principle that the fundamental right of conscience is inviolate. *See The Papers of William Penn*, Vol. I (Dunn & Dunn, University of Pennsylvania Press), pp. 51–52, 90–93, 268, 280, 452, 511. In general, thus, our Commonwealth is neutral regarding religion. It neither encourages nor discourages religious belief. It neither favors nor disfavors religious activity. A citizen of this Commonwealth is free, of longstanding right, to practice a religion or not, as he sees fit, and whether he practices a religion is strictly and exclusively a private matter, not a matter for inquiry by the state.

*Commonwealth v. Eubanks*, 511 Pa. 201, 206, 512 A.2d 619 (1986).

For these reasons, we agree with the Board that Respondent has violated Canons 2(A) and 3(A)(1) of the Code of Judicial Conduct.

## IV. ADDITIONAL FINDINGS AND CONCLUSIONS OF LAW

Although we agree with the Board that the findings of fact and conclusions of law stated heretofore are sufficient to compel Respondent's removal from the bench and that the remaining charges against respondent need not be addressed, it is appropriate, nonetheless, for a fuller understanding of the case, to discuss two other charges, initiating guilty plea bargaining directly with defense counsel in

violation of Pa.R.Crim.P. 319, and unfair treatment of attorneys he disliked.[8]

In July, 1984 Potter County District Attorney Jeffrey Leber was preparing for prosecution of a murder case in which one Richard Cornish had been shot and killed by one Bruce McCaslin. McCaslin may have been acting in concert with Carol Cornish, the decedent's wife, and both she and McCaslin were incarcerated and charged with the murder. In the first week of July, another prisoner, James Thomas, told jail authorities that he had heard McCaslin make certain statements about the Cornish murder which he, Thomas, wished to communicate to authorities. As a result of this information, police arranged for Thomas to be brought to the district attorney's office. Thomas was being held on charges unrelated to the Cornish murder.

Prior to his interview with the district attorney, Thomas waived his right to have counsel present, and in fact, insisted that his counsel not be told of this interview because his counsel represented McCaslin as well. Thomas apparently feared some type of reprisal either from other prisoners, who might find out about the interview, or from his counsel, who might be displeased that Thomas had discussed McCaslin's case with the district attorney. In any event, the district attorney took a statement from Thomas and later gave Thomas a polygraph examination.

After Thomas gave his statement, he then asked to speak with Respondent to request the appointment of a new attorney. Subsequently, on July 10, 1984, Respondent presided over a hearing on a motion for a continuance filed by counsel for defendant McCaslin, based on what defense counsel characterized as prosecutorial misconduct in interviewing Thomas without counsel being present. At that hearing, Respondent stated:

I don't know what the subject matter of that [the conference between Thomas and the district attorney] was, but it was completely unethical for the district attorney to

**8.** *See* n. 1. supra for a summary of charges not addressed by the Board.

communicate with Mr. Thomas without the public defender's consent, particularly when the district attorney knew that the public defender also represented Mr. McCaslin.

That's something—I've been in this business 29 years, and I've never heard of such a thing, never. Not only that, but I do understand that a couple weeks after that initial contact which was made, ... Mr. Thomas ... was taken up to the state police barracks and given a polygraph test again with no notice or no communication or no consent of his counsel who also again at this time still represented Mr. McCaslin.

It is in my view incredible. There is no understanding or appreciation of an attorney/client relationship, there is no understanding or appreciation of confidential communication between attorney and client.

It is clear to me that the district attorney was trying to use one of Mr. Reagle's clients against another one of Mr. Reagle's clients without his permission by virtue of the fact that they're both in jail.

. . . . .

Board Ex. 17, Transcript of Continuation Hearing, *Commonwealth v. McCaslin*, N.T., pp. 10–11 (July 24, 1984). In subsequent hearings Respondent continued to refer to this "worst case" of prosecutorial misconduct, with the result that defense counsel in both the *McCaslin* and the unrelated *Thomas* cases began to build a strategy based on claims of prosecutorial wrongdoing. In *McCaslin*, for example, motions to dismiss were filed on the theory of prosecutorial misconduct. Board Ex. 27, Opinion in *Commonwealth v. McCaslin*, No 21 of 1984 (C.P. Potter Co.). There was, of course, nothing improper in the district attorney's interview with Thomas, since Thomas knowingly, voluntarily, and intelligently waived the presence of counsel, and in any event, was testifying, at his own request, on matters unrelated to charges against him.

On September 13, 1984, while the *McCaslin* case was on appeal from a suppression decision, Respondent purported to order the suppression of the Thomas interview on the

grounds of "prosecutorial misconduct." However, because of the pending appeal, Respondent's court was without jurisdiction to enter an order in *McCaslin*. Subsequently, Respondent recused himself from the *McCaslin* case, and a specially presiding judge ruled that there was no prosecutorial misconduct and that the Thomas interview was not to be suppressed.

On October 15, 1984 Respondent accepted the guilty pleas of James Thomas, the informant in the *McCaslin* case, and his wife Dolly, who were incarcerated for crimes unrelated to the *McCaslin* murder. At the sentencing hearing, Respondent announced that he had negotiated the guilty pleas *himself*, without knowledge of the district attorney. As he put it, "I went to the defense counsel and indicated that if they were to enter a plea of guilty to the charges as set forth, I would impose sentences of incarceration to time served." Board Ex. 24, p. 2, Sentencing Hearing in *Commonwealth v. Dollie and James Thomas*, No. 24 and 25 of 1984 (C.P. Potter County), October 15, 1984. There is no doubt that Pa.R.Crim.P. 319 prohibits judicial involvement in negotiating a guilty plea. Additionally, District Attorney Leber testified before the Board's investigatory panel that James Thomas's sentence was under the minimum time provided for under the sentencing guidelines because he had an extensive criminal record. N.T. 114 (April 16, 1986).

In the matter of Carol Cornish, the wife of the murder victim, the district attorney entered into a plea bargain in which Cornish pled guilty to solicitation to commit murder and tampering with physical evidence, in addition to which Cornish agreed to testify and cooperate in the *McCaslin* trial. The district attorney entered into this plea bargain because he was convinced that there was insufficient evidence to convict her of criminal homicide. Board's Ex. 22, Letter of District Atty Leber to Deputy Atty. General Keuch (October 31, 1984). Respondent presided at the hearing on Carol Cornish's guilty plea hearing and stated as follows:

From what I have read about this case in and out of the file, I can't help but think that this defendant may be the most culpable of the two defendants charged with the singular crime of murder. Borne out if for no other reason than the allegations that this defendant sought to solicit another, namely, Joseph McCaslin, not the person who allegedly committed the act, but another person to commit the crime of murder.

Now, I'm aware that there are certain problems connected with prosecutions, not known to the general public and not known to the Court, but, I got to say that I have grave difficulty with the plea bargain that was entered into between the parties.

I have grave difficulty with the offenses. I think they're too lenient. I have grave difficulty with the suggestion of sentence, that's too lenient. From what I know now, and I understand that there are—can be many facts brought to my attention which I have not thus, far, and properly so not thus far, been brought to my attention.

Perhaps my expression is premature, but I am compelled to express the thoughts which I have expressed, and I guess I'd have to say that it's almost shocking to me. I took the five minute recess because I had to meditate on the issue of how much authority a Court had or didn't have in accepting a plea of guilt.

Had I concluded that I had ultimate authority, I wouldn't have accepted it because I can't express with sufficient clarity and emphasis my disappointment based upon what I have seen in the file and what I have read outside the file.

Board's Ex. 20, *Commonwealth v. Cornish*, Entry of Plea Hearing, 18–20 (July 27, 1984). Ultimately, Cornish's guilty plea was entered, though Respondent continued to assert, as late as the sentencing hearing, "that this particular case represents probably the most grave and serious incident of miscarriage of justice I have ever been connected with." Board Ex. 20, *Commonwealth v. Cornish*, Sentencing

Hearing, 24 (December 3, 1984). Following his acceptance of the plea, Respondent called a press conference in which he stated that the guilty plea in the *Cornish* case was "a gross injustice" and a "travesty of justice." N.T. 1247 (December 3, 1986).

As a result of these events, in August, 1984 District Attorney Leber wrote to the Judicial Inquiry and Review Board to request an investigation of Respondent's judicial conduct. Shortly thereafter, on October 17, 1984 Respondent wrote to the Attorney General of Pennsylvania to request that the Attorney General intervene in the *McCaslin* murder prosecution and the *Cornish* guilty plea on the grounds that the district attorney was acting in these cases for "personal and political" reasons, and that his treatment of the cases was "inconsistent with justice." The Attorney General declined to intervene, presumably because the *McCaslin* case was being vigorously prosecuted (McCaslin was later convicted of first degree murder) and because a plea bargain had been entered into with Carol Cornish that was consistent with the difficulty of litigating the charges against her.

Although any of these acts of the Respondent, taken in isolation, might seem an error of judgment or a matter on which reasonable minds could disagree, taken together, we believe they indicate a pattern of behavior designed to undermine the reputation and career of District Attorney Leber. As discussed above, Respondent purposely mischaracterized the Thomas interview as prosecutorial misconduct; he illegally initiated a plea bargain with the Thomases; he publicly disapproved of the Cornish plea bargain and unjudiciously berated the district attorney for proposing it; and he requested, without good cause, that the Attorney General assume responsibility for certain pending criminal cases. All of this conduct affected the administration of justice in Potter County and none of Respondent's actions had any sound basis in law.

It is significant, we believe, that Respondent's attacks upon the district attorney continued even after the Cornish

plea had been accepted, when in January of 1985 Respondent again contacted the Attorney General of Pennsylvania, this time to request a criminal investigation of District Attorney Leber. Among other matters complained of was Leber's alleged prosecutorial misconduct arising from the arrest and prosecution of George and Walter Stenhach.

Other matters which Respondent complained of are summarized in the Attorney General's letter of June 6, 1985 as follows:

1. Possible marijuana and cocaine usage by the District Attorney, as substantiated by one Lawrence Patterson;

2. The absence of cocaine prosecutions initiated by the District Attorney's Office in Potter County;

3. [The Stenhach matter];

4. Possible conflict of interests between the District Attorney of Potter County and Tioga County Attorney William Hebe.

Board Ex. 31. After an investigation, the Attorney General determined that there was no substance to the charge of drug use; that no drug cases had been prosecuted because no drug arrests had been made; that the Stenhach matter had been processed by the Attorney General's office and Mr. Leber had no part in it; and that any conflict of interest matters should be referred to the Disciplinary Board because they are not criminal.

Respondent's request for a criminal investigation of District Attorney Leber's conduct, in short, was without any basis, just as Respondent's other complaints about the district attorney had been without basis in the *McCaslin*, *Thomas*, and *Cornish* matters. The pattern that emerges from this conduct is that of a vindictive attempt to ruin the district attorney's career.

While it may be a private matter as to whether a judge has personal enemies, he may not allow his personal feelings to affect his behavior on the bench. In this case, Respondent's personal dislike of certain members of the bar

not only affected the way he spoke to them,[9] but also it affected his ability to be fair and impartial in making legal rulings and determinations. This, to understate matters, is abuse of office. We conclude, therefore, that Respondent, in his treatment of the above matters related to the *McCaslin* and *Thomas* cases, violated Canons 2(A) and (B) and 3(A)(1) of the Code of Judicial Conduct in that he did not preserve judicial impartiality; he allowed personal relationships to influence his judicial conduct; and he did not remain faithful to the law and unswayed by partisan interests.

It is, of course, a sad day for this Court when it must remove a judge from office. Judge Fink's judicial conduct, however, has jeopardized the right of those who appear in the courts of Potter County to receive fair and impartial treatment. We are convinced that Respondent Fink has no fundamental understanding of the impartiality and judicious temperament that is required of judges. Judges are not autocrats; they are not police forces; they are not religious advisors; and they do not legislate their own rules and statutes. Rather, they are impartial arbiters under the

9. A typical example of the testimony concerning Respondent's treatment of certain members of the bar is as follows:

JUDGE MUNLEY: Judge, Danny says you berate him. You call him a prick and F-ing this.
JUDGE FINK: That's not true. That's simply not true.
JUDGE MUNLEY: You've never called him that?
JUDGE FINK: I called him a pain in the ass.
JUDGE MUNLEY: Did you ever call him a prick?
JUDGE FINK: No. Never. Now, I always reserved that for his partner.

N.T. 943 (November 20, 1986). Attorney Glassmire testified:

Q. Mr. Glassmire, has Judge Fink ever referred to you in uncomplimentary language?
A. Repeatedly.
Q. What does Judge Fink say to you?
A. Well, he talks in an obscene manner to me on occasion and also calls me various names on occasion.
Q. What names does Judge Fink call you?
A. He has called me a prick, he's called me an ass, he's called me a pain in the ass, he said I lack humility, he's accused me of being arrogant, of being rude, he's just generally berated me on many, many repeated occasions, both publicly and privately.

N.T. 607, (October 17, 1986).

precedents, rules of court and statutes of this Commonwealth to insure that those who appear before them receive justice. The power of a judge is enormous, and concomitantly, no position in our society demands higher standards. Because Harold B. Fink has not met these high standards and because he has violated the Code of Judicial Conduct in the manner discussed herein, we accept the recommendation of the Judicial Inquiry and Review Board that Harold B. Fink be removed from office and "thereafter be ineligible for judicial office," PA. CONST. Art. V, Sec. 18, subsec. (*l*). The Prothonotary is further directed to send a certified copy of this opinion to the Secretary of the Commonwealth and the several county election boards of the Commonwealth. It is so ordered.[10]

LARSEN, J., did not participate in the decision of this case.

NIX, C.J., files a concurring opinion in which McDERMOTT, J., joins.

NIX, Chief Justice, concurring.

I agree with the analysis set forth in the majority opinion with the exception of the finding of a violation of Canon 3(A)(6) of the Code of Judicial Conduct in respondent's criticism of an opinion of this Court, *see* at 367–368. While the comment was in poor taste or even injudicious, it was probably a spontaneous reaction to an unfavorable ruling. Although greater restraint is to be expected from members of the bench of this Commonwealth, it nevertheless must be recognized that even judges share the frailties of human nature. Such a miniscule departure from the deportment expected from the jurists of this Commonwealth should not provide the predicate for disciplinary sanction.

However, eliminating from consideration this complaint against Judge Fink, I am nevertheless constrained to agree

---

**10.** Respondent has raised ten issues on appeal from the Board's determination. Because some of these issues have been addressed in the text of this opinion, and we have reviewed all of the others and find them without merit, these claims are denied.

with the majority that the pattern of behavior set forth on this record compels the conclusion that he is unsuited for judicial office and must be removed from the bench. I therefore join the opinion of the majority, except as noted.

In view of the bizarre behavior reflected in this record, I would be inclined to stay the Order of removal, upon petition on behalf of respondent expressing willingness to undergo a mental evaluation by a competent physician designated by this Court, for a determination as to whether respondent is an appropriate candidate for compulsory retirement under Article 5, section 18(h) of the Pennsylvania Constitution.

McDERMOTT, J., joins in this concurring opinion.