J-A27004-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| SHANE REED | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ELIZABETH REED, | : | |
| | : | |
| Appellant | : | No. 1601 EDA 2025 |
| | : | |
| v. | : | |
| | : | |
| THEODORE REED, | : | |
| | : | |
| Intervenor | : | |

Appeal from the Order Entered June 26, 2025
In the Court of Common Pleas of Bucks County Civil Division at No(s):
2024-61011

BEFORE: BOWES, J., MURRAY, J., and BECK, J.

MEMORANDUM BY BOWES, J.: **FILED DECEMBER 31, 2025**

Elizabeth Reed ("Mother") appeals from the order awarding Theodore Reed ("Paternal Grandfather") shared legal custody and partial physical custody of M.R., born October 2015, and N.R., born January 2017, and which also ordered Mother to undergo a mental health evaluation. We reverse the award of shared legal custody, vacate the remainder of the order, and remand for proceedings consistent with this memorandum.

This matter has an extensive history and was initiated in 2022 when Shane Reed ("Father") filed a custody complaint against Mother as to M.R.

and N.R. in the Montgomery County Court of Common Pleas. The pleadings indicated that Mother and Father married in 2014 and separated in 2020. The trial court summarized the remaining pertinent portions of the proceedings as follows:

> In th[e custody] complaint, Father averred that [Mother] had threatened him, stating that she would be moving to Wisconsin to join a church she found on Facebook because "God told her to do it." On February 2, 2022, the Montgomery County Court of Common Pleas entered an emergency order and indicated that the children are not to be removed or relocated by either party in the case.
>
> The [court] thereafter entered a temporary order . . . and awarded Father primary physical custody of the children. During this brief custodial period, which was from September 10, 2022, to November 16, 2022, [Paternal Grandfather,] helped Father take care of the children. Specifically, [Paternal Grandfather] performed several duties, including but not limited to transporting the children from school, helping the children with their homework and interacting with their teachers, taking the children to doctors' appointments, and putting the children to bed at night.
>
> There were a variety of additional pleadings, custody conferences, and hearings in Montgomery County in the custody matter, culminating in an order on December 8, 2022 (following a hearing . . . at which Father failed to appear), granting [Mother] sole legal and physical custody of the children. [The evidence bore out that Mother had taken M.R. and N.R. out of public school in the months prior and had begun homeschooling them.] On January 26, 2023, Father unfortunately passed away from a drug overdose.
>
> [Paternal Grandfather] subsequently filed a petition to intervene in custody on January 16, 2024, in Montgomery County, and averred that pursuant to 23 Pa.C.S. § 5324, he ha[d] standing to file for physical and/or legal custody of the children. [Paternal Grandfather] indicated that on December 5, 2023, out of concern that the children were not being formally educated, [he] called the Bucks County Truancy Department and inquired whether the

children were registered for homeschooling. [Paternal Grandfather] was referred to the Bucks County Children and Youth ("OCY"), who [evidently incorrectly] informed [Paternal Grandfather] that the children were not registered for any type of schooling. After discovering that [Paternal Grandfather] had contacted OCY, . . . [Mother] promptly ended all communication with [Paternal Grandfather] and prevented the children from having any further contact with him.

[Paternal Grandfather] and [Mother] attended a custody conciliation conference on February 14, 2024, however, the parties were unable to reach an agreement. On March 20, 2024, the Montgomery County Court of Common Pleas entered an order transferring the matter to Bucks County since Mother and the children [moved to and now reside] in Bucks County. [Paternal Grandfather] thereafter filed a motion for a custody hearing date. Th[e] court entered an order . . . scheduling a hearing for September 27, 2024. [Mother] filed a motion for admission *pro hac vice* of Peter K. Kamakawiwoole, Jr., Esq., on September 17, 2024, as the Home School Legal Defense Association (for which [Attorney Kamakawiwoole] is the Director of Litigation), would be associated in the representation of [Mother]. [Paternal Grandfather] subsequently filed an answer to [Mother]'s motion . . ., and requested that th[e] court deny [Mother]'s motion.

At the [first of six total hearings, held] on September 27, 2024, th[e] court determined that [Paternal Grandfather] had standing to seek [partial physical] custody pursuant to 23 Pa.C.S. § 5325(1), and a ruling was reserved on whether [he] had further standing pursuant to 23 Pa.C.S. § 5324. After the hearing, the court entered an interim order and granted [Paternal Grandfather] standing pursuant to 23 Pa.C.S. § 5325(1), granted [Paternal Grandfather] partial physical custody of the children, which allowed [Paternal Grandfather] a dinner visit and two FaceTime calls each week, as well as a six hour visit every Saturday or Sunday (while [Paternal Grandfather] was in Pennsylvania). When [Paternal Grandfather] returned to California[, where he lives with his wife for portions of the year,] th[e] court ordered that he would still receive two FaceTime calls each week.

On December 9, 2024, th[e] court held a second custody hearing and determined that the interim order shall remain in place, but [it] added a requirement . . . that [Paternal Grandfather] shall give [Mother] a two week notice as to when he

wants to exercise his visitation rights. Moreover, th[e] court denied [Mother]'s *pro hac vice* motion and reasoned that [Attorney Kamakawiwoole]'s admission may be detrimental to the prompt, fair, and efficient administration of justice, as well as to the legitimate interest of the parties to the proceedings, other than [Mother], whom [Attorney Kamakawiwoole] intended to represent. The court expanded upon its reasoning in denying the motion and further indicated that the children being homeschooled is not the issue, rather, th[e] court's concern [was] whether the children [were] actually being homeschooled, and if so, how [was] the educational plan being effectively implemented. The custody matter was subsequently relisted for March 3, 2025, due to th[e] court's time constraints and unavailability to conduct a full hearing. [Around this time, Paternal Grandfather purchased a second home in Norristown, Pennsylvania, to enable him to spend longer periods of time in the state.]

. . . .

At the custody hearing on March 3, 2025, [Mother] testified that her friend Joanna[1], who is a member of the "Biker Church" in Boyertown, P[ennsylvania], traveled "in spirit" to [Paternal Grandfather]'s home in California, where she saw [Paternal Grandfather] and his wife talk about [Paternal Grandfather] reporting [Mother] to OCY.

When asked by this Court whether Joanna had any history of mental health treatment or criminal background, [Mother] replied, "Nope." [Mother] further testified that her children and God are ranked equally in terms of importance in her life, however, [Paternal Grandfather]'s counsel offered into evidence a video from [Mother]'s YouTube channel, where [Mother] stated that God comes before her children. When asked by [Paternal Grandfather]'s counsel whether she receives cues from God regarding her children, [Mother] indicated that she is "led to do certain things based on [her] faith with God." When asked by [Paternal Grandfather]'s counsel whether [Mother] is guided by voices or instructions, she simply stated, "Not necessarily. Kind of like you will get an instinct to do something, or your gut feeling about doing something." Notably, [Mother] testified that she has never had any sort of mental health diagnosis and is not willing to

---

[1] No last name was provided in the record.

- 4 -

be examined as she does not "feel it's necessary" and has "no concerns at all for [her] mental health."

Regarding [Mother]'s choice to pull the children out of public school and pursue homeschooling instead, [Mother] stated she "would prefer to educate them at home. There is a lot of benefits to homeschooling. A lot of colleges prefer homeschool graduates over public school graduates." When asked by th[e] court which colleges prefer homeschool over public school graduates, [Mother] was unable to provide specific names. [Mother] further indicated that she "wanted to be able to control what things the children learned and wanted to be able to teach them myself." When asked by [Paternal Grandfather]'s counsel what things [Mother] did not want her children to learn about, she stated, "I didn't want them to be taught . . . about gays and transgenders, I didn't want them to be taught the truth about it." [Paternal Grandfather]'s counsel further inquired about this "truth", to which [Mother] clarified, "It's not the truth about it that it's okay to be [gay and/or transgender]." [Mother] explained that her "big reason" for wanting to homeschool the children is "more quality time, and spending more time together." [Mother additionally attested at length concerning her part-time work schedule, which involved acting as a home health aide for a single client, and how the girls would accompany her to work and the periods during which they would perform book work throughout the day. On average, the children would undergo approximately three and one-half hours a day of formal homeschooling utilizing a workbook provided by a company called Christian Light Education, in addition to engaging in other educational activities within and without the home. The court further asked Mother numerous questions as to why she unintentionally allowed her state-funded insurance for the children to lapse for a period of approximately three months.]

Thereafter, [Paternal Grandfather] testified and indicated that he was concerned with [Mother]'s mental health, specifically her religious views, in which she places God before her children, as well as previously tithing her rent money, which [Paternal Grandfather] provided to her, to an online ministry. [Paternal Grandfather] also testified that he was concerned with [Mother] homeschooling the children, as the children do not have a set school schedule, they seemed to not know how to read [based upon an instance where they could not read inscriptions on a grave at a cemetery], and are not being socialized or exposed to other children. [Paternal Grandfather expressed open

- 5 -

disagreement with Pennsylvania law concerning the requirements for homeschooling children. He additionally recounted that he got into a heated debate with Mother over her decision to have the girls brush their teeth with fluoride-free toothpaste. Paternal Grandfather conceded that the girls are generally in good health, with the caveat that N.R. requires a hearing aid for one ear.]

[Furthermore, a]t the hearing, [Mother]'s counsel called Ms. Carolyn McKeon[, Ph.D.,] to testify as an expert witness in the area of homeschool standardized testing and about her role as [Mother]'s homeschool evaluator. After [Paternal Grandfather's counsel and the trial court extensively questioned] Ms. McKeon regarding her qualifications, the hearing concluded with the court qualifying Ms. McKeon as an expert witness in the area of homeschool standardized testing. The matter was subsequently re-listed for March 13, 2025, as testimony was not completed.

At the custody hearing on March 13, 2025, Ms. McKeon testified to M.R.'s testing results and indicated that she has no concerns with [Mother]'s homeschool program. [Specifically, M.R. took the required Peabody standardized test, scoring in the 34th percentile overall nationwide, with strengths in math and general knowledge, but weaknesses in reading and spelling. Mother began having both girls see a reading tutor weekly and enrolled them to participate in a homeschooling co-operative at a local church, wherein they can meet other similarly-situated students. Dr. McKeon further attested to the fact that Mother provided to her samples of the projects the girls were working on weekly, and that she performs an evaluation as to the compliance of the program each year for Mother and over 600 other students.] At the conclusion of the hearing, th[e] court amended the current interim order and allowed [Paternal Grandfather] more visitation time with the children as he was now residing in Norristown, P[ennsylvania].

. . . .

The custody hearing was resumed on April 11, 2025, in which [Mother] re-explained that beginning in December 2023, she severed the children's relationship with [Paternal Grandfather] as she was made aware in January 2024 by [Paternal Grandfather] that he had initiated a[n OCY] investigation against her.

This severance of [the] relationship with the children was despite the fact that [Paternal Grandfather] was greatly involved [in] the children's lives during [Mother]'s and Father's intact marriage. [Paternal Grandfather] testified that he was "pretty much with the girls all the time . . . except when they were at school." He also indicated that he stayed with the family while the parties were married, and took care of the girls, such as waking them up in the morning, helping them get dressed, feeding them breakfast, making sure they brushed their teeth, etc. After Father passed away, [Paternal Grandfather] testified that he continued to visit the children, however, [Mother] did not allow [Paternal Grandfather] to be alone with the children, and he was only allowed to speak with the children once a week. He further stated that he stopped seeing the children in December 2023 after [Mother] cut him off due to him calling child protective services on her.

Although the [OCY] case was closed and no findings were made, [Mother] decided not to let [Paternal Grandfather] continue to have contact with the children as she "felt that it was in the children's best interest to not have someone in their life that was potentially going to try to take them away from me." While [Mother] agreed that the children love [Paternal Grandfather], she testified that she "does not regret that decision, cutting off [Paternal Grandfather] completely, . . . and believes that the children "are better off without [Paternal Grandfather]."

[Mother] further testified that she believes "[Paternal Grandfather]'s involvement with the children interferes with [her] parent/child relationship," as [Paternal Grandfather] does "a lot of . . . things . . . contrary to the way [Mother has] chosen to raise the girls." Specifically, [Mother] testified that she objected to the children being exposed to Disney movies and materials, as well as the Harry Potter franchise, for a variety of reasons. [Paternal Grandfather] testified that Father allowed the children to watch Disney movies and that [Paternal Grandfather] used to read Harry Potter books to the children when he resided with Father.

[It also came to light that the girls were "up to date" on all immunizations, excepting that Mother chose not to have N.R. receive the second shot of the mumps, measles, and rabies ("MMR") vaccination based on her concern with potential side effects.]

After lengthy testimony, th[e] court continued the matter to May 14, 2025, and made a few modifications to the last interim custody order, which allowed [Paternal Grandfather] overnight visits and other visitation time. . . .

On May 14, 2025, a final hearing was held on this matter. [Mother]'s friend, Leticia Olivieri, testified and indicated that [Mother] directly hears voices from God and the Holy Spirit, as she and [Mother] are both "faith-based." [Ms. Olivieri was also a former supervisor to Mother during a year in which Mother taught pre-school children at a daycare.]

Trial Court Opinion, 7/29/25, at 1-9 (cleaned up).

As will be discussed in greater detail below, the court played a very active role in the various hearings, often subjecting Mother and her witnesses to extensive examination. In particular, the court was heavily involved in questioning witnesses about the homeschooling of M.R. and N.R., as well as Mother's philosophy on religion and how that impacts the decisions she makes in raising the two girls.

On June 26, 2025, the trial court entered a written decision, as well as the appealed-from final custody order. Within its writing, the court concluded that Paternal Grandfather had standing to seek legal custody of M.R. and N.R., finding that "the children are substantially at risk due to parental neglect." Decision, 6/26/25, at 2. As mentioned, the court's order granted Paternal Grandfather shared legal custody with Mother. It also gave Paternal Grandfather substantial partial physical custody, including, among other periods, alternating weekends from Friday evening through Sunday evening;[2]

_____

[2] The order additionally provided that this period be extended to Monday evening during the summer months.

one three-hour dinner visit a week; two non-consecutive vacation weeks per year; and significant overnight and multi-day visits during many holidays. The court furthermore ordered Mother to obtain a mental health evaluation within sixty days, but did not require that any copy of the corresponding report be provided to the court for additional consideration.

This timely appeal followed. Mother included a concise statement within her notice of appeal, and the trial court authored a responsive Pa.R.A.P. 1925(a) opinion, which in part relied upon its June 26, 2025, written decision.

Mother presents the following seven issues for review:

1. Whether the trial court erred in granting [Paternal] Grandfather joint legal and physical custody, absent clear and convincing evidence that the order was narrowly tailored to serve a compelling state interest, as required in third-party custody disputes.

2. Whether the trial court erred in concluding that Mother's lawful homeschool program—undisputedly in compliance with 24 Pa.C.S. § 13-1327.1 and certified by a qualified evaluator as making sustained progress—placed the children at "substantial risk" of "educational neglect."

3. Whether the trial court erred in concluding that Mother's children were at "substantial risk" of medical neglect, where the only evidence was a brief lapse in health insurance coverage, routine parental choices regarding immunizations and dental care, and uncontroverted testimony that the children were healthy, insured, and receiving regular medical and dental treatment.

4. Whether the trial court violated Mother's rights under the . . . First and Fourteenth Amendments to the United States Constitution and Article I of the Pennsylvania Constitution, by awarding joint custody based on her religiously motivated decision to homeschool, absent clear and convincing evidence of harm, which was contrary to

- 9 -

> ***Wisconsin v. Yoder***, 406 U.S. 205 (1972), ***Mahmoud v. Taylor***, 606 U.S. [522] (2025), and Pennsylvania precedent requiring strict scrutiny of any state action burdening religious exercise.

> 5. Whether the trial court violated Mother's substantive due process rights under the Fourteenth Amendment, as recognized in ***Troxel v. Granville***, 530 U.S. 57 (2000), by awarding joint custody to a non-parent over Mother's objection absent clear and convincing evidence sufficient to overcome the presumption that a fit parent acts in her children's best interests.

> 6. Whether the trial court violated Mother's constitutional rights by ordering a psychological evaluation based on Mother's religious beliefs and "preoccupation," contrary to ***Masterpiece Cakeshop v. Colorado C.R. Comm'n***, 584 U.S. 617 (2018), [***Yoder***], and Pennsylvania precedent requiring religious neutrality in custody disputes.

> 7. Whether the trial court deprived Mother of due process by conducting proceedings marked by cumulative error—including expressing skepticism toward her religious motivations, mischaracterizing standardized test evidence, and openly disagreeing with Pennsylvania's homeschool statute—and by denying admission *pro hac vice* to her chosen counsel, thereby infringing her constitutional right to a fair and impartial hearing and to counsel of choice, in violation of the First and Fourteenth Amendments, ***Judicial Inquiry and Review Bd. of Supreme Court of Pennsylvania v. Fink***, 532 A.2d 358 (Pa. 1987), ***United States v. Gonzalez-Lopez***, 548 U.S. 140 (2006), and Pa.R.Civ.P. 1012.1.

Mother's brief at 4-6 (cleaned up).[3]

Generally, Mother attacks on appeal every aspect of the court's final custody order, including its award of shared legal custody and partial physical custody to Paternal Grandfather, as well as the requirement that Mother

_____

[3] Paternal Grandfather did not file a brief in this matter.

undergo a mental health evaluation.[4]  The following legal tenets pertain to our consideration:

> Our standard of review over a custody order is for a gross abuse of discretion.  If a trial court, in reaching its conclusion, overrides or misapplies the law or exercises judgment which is manifestly unreasonable, or reaches a conclusion that is the result of partiality, prejudice, bias or ill will as shown by the evidence of record, then discretion is abused.  Our scope of review over custody disputes is broad; this Court is not bound by the deductions and inferences the trial court derives from its findings of fact, nor must we accept the trial court's findings of fact when these findings are not supported by competent evidence of record.  Our paramount concern in child custody matters is the best interests of the children.

*Yates v. Yates*, 963 A.2d 535, 538-39 (Pa.Super. 2008) (citation omitted).

We first consider Mother's claims as they relate to the trial court's decision to award Paternal Grandfather shared legal custody.  In so doing, the court concluded that Paternal Grandfather had standing pursuant to 23 Pa.C.S. § 5324(3).  "Determining standing in custody disputes is a threshold issue that must be resolved before proceeding to the merits of the underlying custody action."  *C.G. v. J.H.*, 193 A.3d 891, 898 (Pa. 2018) (citation

---

[4] At the outset, we note that while Mother raises seven claims, her appellate brief does not contain an argument section corresponding to each issue presented, in violation of our appellate rules.  *See* Pa.R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part--in distinctive type or in type distinctively displayed--the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent.").  Nonetheless, because we can ascertain Mother's claims on appeal, we opt not to sanction her.  *See*, *e.g.*, *Womer v. Hilliker*, 908 A.2d 269, 277 (Pa.Super. 2006) (noting that appellate courts have the "authority to disregard procedural errors that do not affect substantial rights").  Counsel is cautioned, however, to abide by the Rules of Appellate Procedure in future matters.

omitted).  Additionally, "[i]ssues of standing are questions of law; thus, the standard of review is *de novo* and the scope of review is plenary." ***Id***. (citation omitted).

The statute relied upon by the trial court provides standing for certain third parties seeking legal custody.  Relevant here, that extends to:

> A grandparent of the child who is not *in loco parentis* to the child:
>
>> (i) whose relationship with the child began either with the consent of a parent of the child or under a court order;
>>
>> (ii) who assumes or is willing to assume responsibility for the child; and
>>
>> (iii) when one of the following conditions is met:
>>
>>> . . . .
>>>
>>> (B) the child is substantially at risk due to parental abuse, neglect, drug or alcohol abuse or incapacity[.]

23 Pa.C.S. § 5324(3).

In its Rule 1925(a) opinion, the court found that this requirement was satisfied, opining with respect to subsection (3)(iii)(B) that "the children are substantially at risk due to parental neglect by [Mother]."[5]  Trial Court Opinion, 7/29/25, at 15.  Particularly, it determined that Mother lacks the ability "to provide her children with a proper education, medical, and dental care." ***Id***. at 16.  With respect to schooling, the court found that Mother "has no interest

---

[5] There is no dispute by Mother that Paternal Grandfather began his relationship with M.R. and N.R. with the consent of Father and that he is willing to assume responsibility for the children.

- 12 -

in providing a proper education and is neglecting to appropriately educate her children." *Id*. It additionally stated that Mother "barely had a high school diploma" and felt that Mother's desire to homeschool the children was to satisfy her own religious beliefs and personal desires above the educational needs of the girls. *Id*. at 23-24. The court indicated that it was uneasy about the homeschooling schedule provided by Mother, since it entailed fewer hours of formal education than those undertaken by students in public schools, and believed that M.R. was "miserably failing in a few subject areas and is barely meeting the child testing requirement of 35%." *Id*. at 24.

The court also expressed its concern that Mother allowed the children's medical insurance to lapse for a period of three months and decides to take medical and dental advice from videos she has seen on YouTube. *Id*. at 17. The court's opinion furthermore directed us to its previous written decision, wherein it discussed that Mother declined for N.R. to receive the second MMR vaccine dose recommended by the Centers for Disease Control and that one of the medical documents entered into evidence listed N.R. as being "overdue" for an audiology appointment. *See* Decision, 6/26/25, at 8-9. The court showed uncertainty as to whether the girls were receiving proper dental care, finding that it was not definitively proven through the admitted exhibits. *Id*. at 9. Finally, it highlighted the testimony that Mother only allows her children to utilize fluoride-free toothpaste. *Id*. at 10.

In response, Mother argues that Paternal Grandfather failed to prove by clear and convincing evidence that she was neglecting the girls' education.

- 13 -

*See* Mother's brief at 24-40. She contends that the homeschool program that she administers for her daughters is undisputedly in compliance with Pennsylvania law. *Id*. at 24-30. Mother avers that the court erroneously found, without record support, that she neglected bookwork and instead relied upon "field trips" to places like her work or the local library as a substitute for proper education. *Id*. at 31-32. Mother recounts that, to the contrary, she uploads the children's work to Dr. McKeon for review weekly, and that by the collective testimony of Dr. McKeon and Mother, several hours of personalized daily homeschooling could teach a student as much as a full eight-hour day in a public school since the teacher's attention is undivided. *Id*. at 32-35. Mother additionally faults the trial court's characterization of M.R.'s test scores as "abysmal" because the thirty-fourth percentile meant that M.R. performed better than a third of students nationwide and fell within an "average range." *Id*. at 36-40.

Mother also contends that Paternal Grandfather failed to carry his burden in showing any risk to the children's health through her actions or inactions. *Id*. at 40-44. She states that "[t]he decision below makes no argument that producing a[n exhibit entitled a] 'Private Dentist Report of Dental Examination' poses any threat to the girls, especially when [documents] record that both children received cleanings on September 7, 2024." *Id*. at 41-42. Mother also avers that reasonable minds can differ as to the purported harm caused by brushing without using fluoride, and in any event, Mother's dentist expressed no concern over the decision. *Id*. at 42.

She concedes that the health insurance lapsed for a brief period due to Mother making too much money, but it was quickly remedied and had no actual detriment to the children, who are generally in good health. *Id*. Mother adds:

> Finally, the court's concerns about one declined MMR booster, a hearing screen, and a vision screen do not amount to neglect. While N.R.'s medical report from April 2025 does say she "failed" a vision screen, the progress notes entered by the nurse practitioner states only that she had 20/30 and 20/40 vision in her left/right eyes, without corrective lenses. An audiology screening was also not administered at N.R.'s April check-up; but as the report notes, that was because it had already been administered in late 2022 by [the audiologist], who prescribed N.R. her hearing aid. Regarding immunizations, Commonwealth law expressly recognizes the right of a parent to decline immunizations, *see* 28 Pa. Code § 23.84; 23 Pa.C.S. § 6304(b), and Mother testified that she discussed the situation with her children's physician, who did not press the matter over her objection. [Paternal] Grandfather has proffered no clear and convincing evidence to rebut any of this evidence. And the decision below cites no authority that suggests these facts, without more, would ever rise to the level of medical neglect, or justify the loss of physical and legal custody.

*Id*. at 43-44 (citation altered).

Upon *de novo* review, we determine that the trial court erred in concluding that Paternal Grandfather had standing to pursue legal custody pursuant to § 5324. Particularly, Paternal Grandfather did not demonstrate that the girls were "substantially at risk due to parental abuse, neglect, drug or alcohol abuse or incapacity." 23 Pa.C.S. § 5324(3)(iii)(B). Concerning the adequacy of the girls' education provided by Mother, we preliminarily note that homeschooling is statutorily permissible under Pennsylvania law. *See* 24 P.S. § 13-1327.1 (setting forth the requirements for a home education program). The court did not find, and our review does not bear out, that

Mother's homeschooling program fails to comply with the law in any respect. To the contrary, Mother opts to send her sample schooling materials to Dr. McKeon weekly as opposed to yearly, which is significantly more frequent than required by law. Dr. McKeon noted that Mother appropriately logged the minimum number of education days and had annually submitted the paperwork required by the local school district for homeschooling compliance. Mother's testimony was that she averages approximately three and one-half hours a day of direct schoolwork utilizing a commercial curriculum from Christian Light Education, with Dr. McKeon confirming that this comports with the amount of instruction she observes from many of the families of the 600 students that she oversees. *See* N.T., 3/3/25, at 25-26; N.T., 3/13/25, at 21-22.

We also agree with Mother that the court's characterization of M.R.'s standardized test score as "miserably failing" or "barely passing" is unsupported. A standardized testing score placing her in the thirty-fourth percentile overall indicates that M.R. performed better on the exam than one-third of similarly-aged students nationwide. Mother has undisputedly taken steps to address M.R.'s difficulties with reading and spelling by providing her with a tutor, whom she sees weekly. We further note that M.R.'s math and general knowledge scores demonstrated that she is advanced for her current grade level by roughly a year.

Similarly, we cannot conclude that there is evidentiary support for the notion that Mother has placed the girls at substantial risk of neglect relating

to their health. Paternal Grandfather presented no evidence that having the children brush their teeth with fluoride-free toothpaste would subject them to harm, or that either girl has any issues relating to her teeth or gums. The same holds true for Mother's decision not to have N.R. immunized with the second shot of the MMR vaccine. *See* 28 Pa. Code § 23.84 (allowing for both medical and religious exemptions from immunization regarding the requirements for school health). Finally, the record supports Mother's contention that she has been tending to N.R.'s needs as it relates to her hearing aid and necessary audiology appointments.

In short, it is evident that both the trial court and Paternal Grandfather have drastically different ideas from Mother as to how M.R. and N.R. should be raised. Indeed, the trial court expressed that it was "shocked" when it learned of the Commonwealth's requirements for a compliant homeschooling program, and seemingly found the minimum standards inferior to a traditional public school education. *See* Decision, 6/26/25, at 5. Nonetheless, we find no support that any of the information identified by the court in either its written decision or Rule 1925(a) opinion demonstrates a substantial risk of neglect. Without this showing, Paternal Grandfather simply did not meet his burden to establish standing to seek legal custody. That part of the order therefore must be reversed, along with his award of shared legal custody.

Next, we turn to the court's decision to grant Paternal Grandfather partial physical custody. There was no dispute by the parties that Paternal Grandfather had standing to pursue the same as the parent of Father, who

had passed away. *See* 23 Pa.C.S. § 5325(1) (stating that "where the parent of the child is deceased, a parent or grandparent of the deceased parent may file an action under this section"); *see also* N.T., 9/27/24, at 3.

The General Assembly has set forth specific factors a court must weigh before determining physical custody requests. More particularly, the court was required to abide by the following version of 23 Pa.C.S. § 5328(a), which was in effect at the time of the custody hearings:[6]

> In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving substantial weighted consideration to the factors specified under paragraphs (1), (2), (2.1) and (2.2) which affect the safety of the child, including the following:
>
> (1) Which party is more likely to ensure the safety of the child.
>
> (2) The present and past abuse committed by a party or member of the party's household, which may include past or current protection from abuse or sexual violence protection orders where there has been a finding of abuse.
>
> (2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).
>
> (2.2) Violent or assaultive behavior committed by a party.

---

[6] We note that § 5328(a) has been amended since entry of the final custody order. The newer version largely consolidated and reorganized several of the custody factors. *See* 23 Pa.C.S. § 5328 (effective August 29, 2025).

It is well-settled that "[n]o statute shall be construed to be retroactive unless clearly and manifestly so intended by the General Assembly." 1 Pa.C.S. § 1926. Since the amendment to § 5328 contained no such retroactivity clause and the proceedings concluded before the changes took legal effect, we do not apply this revised version.

(2.3) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party if contact is consistent with the safety needs of the child.

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life, except if changes are necessary to protect the safety of the child or a party.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's developmental stage, maturity and judgment.

(8) The attempts of a party to turn the child against the other party, except in cases of abuse where reasonable safety measures are necessary to protect the safety of the child.  A party's reasonable concerns for the safety of the child and the party's reasonable efforts to protect the child shall not be considered attempts to turn the child against the other party.  A child's deficient or negative relationship with a party shall not be presumed to be caused by the other party.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child or self from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a) (effective August 13, 2024 to August 28, 2025).

Additionally, we note that

where the custody dispute is between a biological parent and a third party, the burden of proof is not evenly balanced. In such instances, the parents have a *prima facie* right to custody, which will be forfeited only if convincing reasons appear that the child's best interest will be served by an award to the third party. Thus, even before the proceedings start, the evidentiary scale is tipped, and tipped hard, to the biological parents' side.

*V.B. v. J.E.B.*, 55 A.3d 1193, 1199 (Pa.Super. 2012) (citation omitted). Stated another way, "[i]n any action regarding the custody of the child between a parent of the child and a nonparent, there shall be a presumption that custody shall be awarded to the parent. The presumption in favor of the parent may be rebutted by clear and convincing evidence." 23 Pa.C.S. § 5327(b). We have explained that the "standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing so as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *V.B.*, 55 A.3d at 1199 (citation omitted).

- 20 -

In support of its decision to award partial physical custody to Paternal Grandfather, the trial court determined he "has demonstrated . . ., through clear and convincing evidence, that he is more equipped and able to ensure the children's need for stability and continuity in their education, family, and community lives." Trial Court Opinion, 7/29/25, at 16. The court was concerned about Mother's purported failure to tend to the girl's physical development, as well as her decision to cut Paternal Grandfather off completely and deprive the children of socialization outside her church. *Id*. at 16-17. It placed significant weight on Paternal Grandfather's willingness to relocate to Pennsylvania from California and his testimony that he often took the children out to do activities within the community. *Id*. at 16. The court acknowledged that there is a presumption that Mother is entitled to custody over Paternal Grandfather, but reiterated many of the concerns discussed above as to the girls' schooling and health. *Id*. at 18-19. It also cited caselaw for the proposition that our legislature has "intended continuing contact between children [and] grandparents when a parent is deceased[.]" *Id*. at 19. Finally, the court determined that it did not abuse its judicial discretion in directly asking Mother or her witnesses questions about her religious beliefs or homeschool program, or allowing Paternal Grandfather's counsel to do the same, since those matters went to the best interests of the children. *Id*. at 20-28.

In her brief, Mother does not argue that specific factors enumerated in § 5328 favor granting her custody over Paternal Grandfather, but rather that

that the court's bias tainted its consideration of the factors as whole. To that end, Mother argues that the court erred in awarding partial physical custody to Paternal Grandfather because it held against Mother her constitutional right to homeschool her children and her religious beliefs. **See** Mother's brief at 44-46; 49-54. She additionally accuses the court of failing to apply the presumption the Mother acts in the best interest of her children. **Id**. at 46-48. Mother contends that throughout the proceedings, the court demonstrated partiality, evidenced by things such as the denial of her motion for admission of counsel *pro hac vice* and extended questioning of Mother as to her religious convictions, including multiple examples wherein she believed the court did not respect Mother and her witnesses. **Id**. at 55-69. She avers that the court's conduct "undermined the neutrality that custody proceedings require. Instead of applying the presumption that a fit parent acts in her child's best interest, the court substituted skepticism of lawful educational and religious choices. That error requires reversal." **Id**. at 68.

After a thorough review of the certified record, we are persuaded by Mother of sufficient instances in the proceedings demonstrating partiality and bias by the trial court, so as to undermine its award of physical custody to Paternal Grandfather. To begin, the record demonstrates that the court overstepped its bounds in questioning witnesses, often interrogating them for extended lengths of time. **See**, **e.g.**, N.T., 3/3/25, at 29-33 (questioning Mother's personal beliefs as it relates to acceptance of those in the LGBTQ+ community); *id*. at 52-54 (chastising Mother for failing to timely submit

medical insurance paperwork on behalf of the children); *id*. at 136-56 (extensively inquiring into the qualifications of expert witness, Dr. McKeon, and the merits of homeschooling more generally, after Paternal Grandfather's counsel completed his voir dire);[7] N.T., 3/13/25, at 47-50 (compelling Dr. McKeon to explain why the Peabody standardized examination, approved by the Commonwealth for homeschooled students, is as good a measure of ability compared to tests taken by public school students); N.T., 4/11/25, at 17-22 (challenging Mother's decision not to have N.R. receive the second shot of the MMR vaccine); *id*. at 65-67 (same as to Mother's choice to brush the children's teeth with fluoride-free toothpaste); *id*. at 88-92 (pressing Mother to explain why it is problematic for Paternal Grandfather to allow the girls to watch Disney movies); *id*. at 93-95 (same as to Mother not permitting her daughters to read the Harry Potter book series); *id*. at 97-99 (questioning why Mother explained the circumstances of Father's death to her daughters instead of allowing a therapist to do so); *id*. at 122-31 (interrogating Mother about her schedule for homeschooling the children).

Many of these exchanges, based on the volume of the court's questions, its refusal to accept answers as given, and its tone, portrayed the court as an advocate against Mother. *See*, *e.g.*, *Commonwealth v. Manning*, 435 A.2d 1207, 1211 (Pa.Super. 1981) ("Although the law is clear that a trial judge may

---

[7] While it does not have a significant bearing on our analysis, we would be remiss if we did not notice that the trial court appeared to refuse to acknowledge Mother's homeschooling expert as "Dr." McKeon, despite her having a Ph.D. in K-12 education.

interrogate a witness, the judge should not assume the role of an advocate, express an opinion on the merits of the case or cast doubt on the witness' credibility."). For example, when Mother explained that she did not want her daughters reading Harry Potter due to its subject matter involving witches, the court called a recess and directed Mother to review the Bible available within the courtroom to locate verses supporting her notion that the Bible speaks out against witchcraft and magic. *See* N.T., 4/11/25, at 94. The court further devoted significant time to questioning Mother's character witness, Ms. Oliveri, after Paternal Grandfather's counsel completed cross-examination. Particularly, it directed Paternal Grandfather's counsel to re-display exhibits previously admitted during the hearings and confronted her about statements made by Mother in certain YouTube videos, directly challenging Ms. Olivieri's testimony as it related to Mother's religious convictions about whether Jesus accepts those within the LGBTQ+ community. *See* N.T., 5/14/25, at 24-35.

The record is also littered with judicial comments and questions that appeared outright hostile to Mother, her counsel, Mother's religious affiliation, and the homeschooling system in general. In response to a remark from Mother that homeschooling is not the same as public school in the home setting, the court stated: "I think that that's clear to everybody." N.T., 3/3/25, at 41. On another occasion, when Mother testified that her daughters received counseling, the court asked where and interjected, with apparent exasperation: "Please don't tell me The Biker Church." *Id*. at 45. After Mother stated that she did not feel it was necessary to go to her local school

to determine what it offers because she did not want to send M.R. and N.R. there, the court retorted: "You don't feel it's necessary to educate yourself on that the public school system has to offer your children in terms of an education?" *Id*. at 32. Counsel lodged an objection to this line of questioning, citing Mother's constitutional right to homeschool her children without elucidation, and the court openly stated, "I don't care. I want an explanation." *Id*. at 33.

Additionally, when Mother attested that she did not want financial contributions from Paternal Grandfather because she believed it showed that "he wants another form of control in the girls' life," the court became argumentative. It then asked Mother, "do you not understand" that Paternal Grandfather was trying to "do what he thinks is the best thing for the girls," twice, directly contradicting Mother's belief that Paternal Grandfather is prying into their lives. *Id*. at 49. The court refused to accept Mother's answer that she forgot to timely submit the paperwork to secure the children's medical insurance, asking her repetitively to explain why she forgot, and openly expressed disapproval of Mother's answers. *Id*. at 52-54 (The court chastising, "What do you mean you don't know" when Mother stated that she did not know why she failed to get the paperwork in on time, and the court expressing "I'm at a loss to understand that kind of an answer."). It also appeared to demonstrate strong feelings on the record with respect to Mother's decision to tithe money, despite the children having their essentials taken care of, as well as Mother's choice not to give Paternal Grandfather the

girls' social security numbers based on the fact that she did not trust him. *Id*. at 55-56, 58-59. Mother expressed on the stand that she felt the court was placing her religious beliefs on trial, to which the court abruptly cut her off mid-sentence. *Id*. at 56.

Furthermore, the court told Mother's attorney on numerous occasions to "sit down" or "have a seat" after making objections to many of the points discussed above. *See*, *e.g.*, N.T., 3/3/25, at 12, 33, 39; N.T., 5/14/25, at 18. This was done in conjunction with the court explaining that it independently researched counsel's law firm website to confirm whether he is a Christian lawyer after accusations from Paternal Grandfather on the stand that counsel practices "Christian law" and is "cultish." N.T., 3/3/25, at 111, 122.

On top of this, the court denied Mother's motion for *pro hac vice* admission of Attorney Kamakawiwoole in December of 2024. The court indicated that it did so to prevent a delay in the proceedings. Yet it conducted four additional hearings and did not render its final order until June 2025, approximately seven months after denial. The court was aware that Attorney Kamakawiwoole was a litigator with extensive knowledge and insight concerning homeschooled families. At the later hearings, both Paternal Grandfather and the court actively questioned Mother and her expert concerning homeschooling, testing, and the like. As such, the court's justification for denial was not compelling. *See* Pa.R.Civ.P. 1012.1 ("The court

**shall** grant the motion [for admission *pro hac vice*] unless the court, in its discretion, finds good cause for denial." (emphasis added)).

We recognize that many of the decisions of the trial court, such as whether to question witnesses or grant a motion for admission of counsel *pro hac vice*, lie within the court's discretion. However, when viewed collectively, the above actions, coupled with the law's presumption that Mother is entitled to physical custody of the children against a third-party, constrain us to find that the court's custody award was grounded in partiality and bias. ***See Yates***, 963 A.2d at 538. Accordingly, the court's best interest analysis cannot stand, and we vacate the award of partial physical custody.

Finally, we consider the court's custody order insofar as it directed Mother to undergo a mental health evaluation. By rule in custody proceedings, "[t]he court may order the child(ren) and/or any party to submit to and fully participate in an evaluation by an appropriate expert or experts." Pa.R.Civ.P. 1915.8.

Here, the directive to obtain an evaluation was not tied to the trial court's decision as to whether Paternal Grandfather should be given partial physical or legal custody. Instead, this requirement was included in the final custody order after that issue was resolved and does not even require that the results be provided to the court. It is thus clear that the court ordered the evaluation not to benefit it in making its decision, but rather to subject Mother to an examination that may never influence another judicial determination, based solely upon Mother's religious statements. When

considered in this context, combined with the various examples of bias and partiality exhibited by the trial court throughout the entirety of these proceedings discussed above, we determine that Rule 1915.8 does not support the evaluation, and the court abused its discretion in ordering it. Hence, we also vacate this portion of the order.

Based on the above, we reverse the portion of the trial court's order awarding Paternal Grandfather shared legal custody, and vacate the parts awarding him partial physical custody and directing Mother to undergo a mental health evaluation.[8]

Order reversed in part and vacated in part. Case remanded. Jurisdiction relinquished.

---

[8] Mother has not requested that this Court remand the matter before another jurist. "Generally, a party must seek to have a judge recused from a case, by first bringing the petition for recusal before that jurist, thus enabling the judge to evaluate the reasons for recusal firsthand." *In re Adoption of L.J.B.*, 18 A.3d 1098, 1112 (Pa. 2011) (citation omitted). Our Supreme Court has held that *sua sponte* removal of a lower court judge "exceed[s] the authority of the Superior Court. The parties are required to file a motion to recuse and for the judge in question to rule; his or her decision must stand absent an abuse of discretion." *Commonwealth v. Whitmore*, 912 A.2d 827, 834 (Pa. 2006). Since Mother has not made a specific recusal request as to the trial court, there is no motion for the trial court to rule on, and no discretion for us to review. As we cannot *sua sponte* address this claim, and it cannot be raised for the first time on appeal, we do not reach this issue. Should Mother wish to pursue this, she may file a petition for recusal with the trial court upon remand.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/31/2025